ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE BUSINESS ROUNDTABLE )
1615 L Street, N.W. )
Washington, D.C. 20036, )
)
    and )
)
CHAMBER OF COMMERCE OF )
    THE UNITED STATES OF AMERICA )
1615 H Street, N.W. )
Washington, D.C. 20062, )
)
    and )

CASE NUMBER  1:00CV03088

JUDGE: Ellen Segal Huvelle

NATIONAL ASSOCIATION OF
    MANUFACTURERS
1331 Pennsylvania Ave., N.W.
Washington, D.C. 20004,

DECK TYPE: Civil General

DATE STAMP: 12/22/2000

    and

ASSOCIATED GENERAL CONTRACTORS )
    OF AMERICA, INC. )
333 John Carlyle Street, Suite 200 )
Alexandria, VA 22314, )
)
    and )

FILED

DEC 2 2 2000

)
ASSOCIATED BUILDERS AND )
    CONTRACTORS, INC. )
1300 North 17th Street, Suite 800 )
Rosslyn, VA 22209 )
)
    *Plaintiffs*, )
)
          v. )
)
THE UNITED STATES )
c/o Attorney General Janet Reno )
United States Department of Justice )
950 Pennsylvania Ave., N.W., Room 4545 )
Washington, D.C. 20530, )
)
    and )
)

THURMAN M. DAVIS                                    )
Acting Administrator,                               )
General Services Administration                     )
18th and F Streets, N.W.                            )
Washington, D.C.  20405,                            )
                                                    )
        and                                         )
                                                    )
WILLIAM S. COHEN                                    )
Secretary of Defense                                )
The Pentagon                                        )
Washington, D.C.  20350,                            )
                                                    )
        and                                         )
                                                    )
DANIEL S. GOLDIN                                    )
Administrator, National Aeronautics and             )
Space Administration                                )
300 E Street, S.W.                                  )
Washington, D.C.  20546,                            )
                                                    )
        and                                         )
                                                    )
KENNETH J. OSCAR                                    )
Acting Deputy Administrator                         )
Office of Federal Procurement and Policy            )
Office of Management and Budget                     )
Eisenhower Executive Office Building                 )
17th Street & Pennsylvania Avenue, N.W.             )
Washington, D.C.  20503,                            )
                                                    )
        and                                         )
                                                    )
JACOB J. LEW                                        )
Director, Office of Management and Budget           )
Eisenhower Executive Office Building                 )
17th Street & Pennsylvania Avenue, N.W.             )
Washington, D.C.  20503,                            )
                                                    )
                            *Defendants.*           )
                                                    )

## I.
## COMPLAINT

Plaintiffs The Business Roundtable, Chamber of Commerce of the United States of America, National Association of Manufacturers, Associated General Contractors of America, Inc., and Associated Builders and Contractors, Inc. (collectively "Plaintiffs"), complain of the defendants and, for their claims of relief, state as follows:

## II.
## OVERVIEW OF THE COMPLAINT

1.     On December 20, 2000, the Federal Acquisition Regulation ("FAR") Council published a regulation in the *Federal Register* amending Part 9 of the FAR to require that agencies must, before awarding every federal contract, determine whether prospective contractors are in "satisfactory compliance with the law" – federal, foreign, state or local – when determining whether a contractor is "responsible" to perform a particular contract.  65 Fed. Reg. 80,256 (2000) ("Final Rule").  The Final Rule placed particular focus on tax, labor and employment, environmental, antitrust and consumer protection laws.

2.     It also amended two existing FAR Part 52 certification provisions to require contractors to certify whether within the preceding three years they have violated state and federal tax, labor and employment, environmental, antitrust and other consumer protection laws. Finally, the Final Rule also amended Part 31 of the FAR to prevent contractors from recovering certain previously allowable costs, including contractors' legal defense costs if they are ultimately found to have violated any state, federal, or foreign law or regulation in a civil action, as well as the costs contractors incur in responding to unionization campaigns.

3.     Incredibly, this final rule, which will cost hundreds of millions of dollars to implement, was issued despite vociferous opposition voiced during the notice and comment

period from government contractors, bipartisan groups of federal legislators, and -- amazingly

enough -- the very federal agencies that promulgated it.  In brief, the Final Rule is fraught with

errors and is invalid for the following reasons:

- The FAR Council has acted arbitrarily by failing to articulate any rational basis or need for this significant change in the FAR responsibility standards; ignoring the concerns raised by the Government's own procurement professionals that the government lacks the expertise and resources needed to implement the Rule; failing to demonstrate that any benefits of this change offset its enormous costs; and irrationally removing the requirement of a nexus between responsibility and a contractor's ability to perform a particular contract.

- By allowing individual federal agencies to deny contracts based upon violations of any law, the FAR Council has exceeded its authority to promulgate procurement regulations and has effectively amended by administrative fiat substantive federal laws that are addressed by the Final Rule  -- including the National Labor Relations Act ("NLRA").

- In issuing the Final Rule, the FAR Council for the first time informed interested parties that the changes to FAR Part 9 now include evaluation of their compliance with "the law," including all state and foreign laws, and that changes to FAR Part 52 now require contractors to certify to their compliance with state felony laws.  By failing to notify contractors of these dramatic changes during the public comment period, the FAR Council has deprived interested parties of a meaningful opportunity to participate in this important aspect of the rulemaking.

- The Final Rule allows the Government to deny federal contracts without affording contractors minimal due process protections, and is so vague that it fails to provide contractors or the Government with sufficient notice of the standards to be applied and evidence to be considered in making a determination of responsibility.

- The amendment to the FAR certification provision for commercial item acquisitions is in direct violation of statutes forbidding specific certifications in the procurement of commercial items.

- The changes to Part 31 conflict with the Major Fraud Act, which dictates when legal costs are recoverable, as well as the FAR Council's own stated policy of remaining neutral in matters of labor relations.

- The FAR Council failed in its obligations, under the Paperwork Reduction Act ("PRA") and the Regulatory Flexibility Act ("RFA"), to evaluate

properly the Final Rule's paperwork burden and its impact on small
businesses.

4.      In short, the Final Rule, like the June 2000 proposed rule before it, is a "solution

in search of a problem."  The Government has failed to articulate any rational basis for the Final

Rule, and should not be permitted to impose such an enormous burden on Plaintiffs, other federal

contractors, and federal agencies, through issuance of this irrational rule, which is riddled with

legal errors and was not promulgated in accordance with applicable rulemaking procedures.  The

Final Rule is arbitrary, capricious, an abuse of discretion, and unlawful, and must be stricken.

### III.
### PARTIES

5.      Plaintiff The Business Roundtable ("BRT") is a not-for-profit business league,

organized and existing under the laws of the State of New York, that is comprised of leading

U.S. corporations with a combined workforce of more than ten million employees in the United

States.  BRT members have contracted, and continue to seek contracts, with virtually all federal

agencies, and perform many of the most sensitive and significant contracts the United States

enters.  The BRT is dedicated to improving the effectiveness of federal government regulatory

processes and to increasing government accountability for the costs of regulation.

6.      Plaintiff Chamber of Commerce of the United States of America ("the Chamber")

is a non-profit corporation organized and existing under the laws of the District of Columbia.

The Chamber is the largest federation of business, trade, and professional organizations in the

United States.  It represents an underlying membership of more than three million businesses and

organizations of every size, sector, and region.  Ninety-six percent of the Chamber's members

are businesses with fewer than 100 employees.  The Chamber's members have contracted, and

continue to seek contracts, with virtually all federal agencies.  An important function of the

Chamber is to represent the interests of its members in significant and substantial matters before the federal courts, the Congress, the Executive Branch, and independent agencies.

7.     Plaintiff National Association of Manufacturers ("NAM") is a non-profit corporation organized and existing under the laws of the State of New York.  Founded in 1895, NAM is the nation's oldest and largest broad-based industrial trade association.  Its nearly 14,000 member companies and subsidiaries, including 10,000 small and mid-sized manufacturers, employ approximately 85% of all manufacturing workers and produce over 80% of the nation's manufactured goods.  NAM also represents 350 member associations serving manufacturers and employees in every industrial sector and all 50 states.  NAM's members include the majority of federal contractors in the manufacturing sector.  NAM's mission is to enhance the competitiveness of manufacturers and to improve living standards for working Americans by shaping a legislative and regulatory environment conducive to U.S. economic growth.

8.     Plaintiff Associated General Contractors of America, Inc. ("AGC") is a trade association incorporated under the laws of the District of Columbia.  Founded in 1918, AGC is the largest and oldest construction trade association in the United States.  It represents more than 33,000 firms -- including both union and open shop contractors, and many small businesses -- through a network of more than 100 state and local chapters across the United States.  AGC's regular members include approximately 7,500 of the nation's leading general construction contractors, which perform the majority of the construction of public, commercial and residential buildings, shopping centers, factories, industrial facilities, highways, bridges, tunnels, airports, waste treatment facilities, dams, water conservation projects, and defense facilities in the United States.  Its associate members include approximately 12,000 specialty contractors and more than 14,000 suppliers of construction equipment and materials and professional services.  Many of

AGC's members regularly seek and perform work for the federal government.  AGC's goal, among other aims, is to promote better relations between public bodies and construction contractors, to maintain high professional standards in the conduct of construction work, to combat unfair practices, and to support contractors in efforts to rectify conditions of an unsatisfactory nature.

9.       Plaintiff Associated Builders and Contractors, Inc. ("ABC") is a national trade association of more than 22,000 construction industry contractors, suppliers and related firms. ABC is a trade association incorporated under Maryland law.  ABC's members share the philosophy that construction work should be awarded and performed on the basis of merit, regardless of labor affiliation.  The majority of ABC's members are small businesses, many of whom perform work directly and indirectly for the United States.  Many of ABC's members, along with other construction industry employers, have been the targets of a practice known as "salting abuse," by which agents of labor organizations unfairly target such employers with unfair labor practice charges and other forms of litigation designed to create the false impression that the employers are labor law violators.  ABC has led the fight against such tactics in Congress and the courts.

10.      As government contractors, Plaintiffs' members will be forced immediately to comply, at significant cost, with the revised responsibility standards, certification requirements and cost allowability provisions set forth in the Final Rule.

11.      Defendant The United States ("United States" or "Government") is ultimately responsible for the actions against which this Complaint is made.  The relief Plaintiffs seek extends to all federal agencies subject to the FAR and to all of the employees, officers and agents of those agencies.

12.     Defendant Thurman M. Davis is the Acting Administrator at the General Services Administration ("GSA").  GSA, along with the Department of Defense ("DOD") and the National Aeronautics and Space Administration ("NASA"), is responsible for promulgating the FAR and published the contested rule in the *Federal Register*.  Acting Administrator Davis is sued in his official capacity, and the relief Plaintiffs seek extends to all of his successors and to all of the employees, officers and agents of GSA.

13.     Defendant William S. Cohen is the Secretary of Defense.  DOD, along with GSA and NASA, is responsible for promulgating the FAR and published the contested rule in the *Federal Register*.  Secretary Cohen is sued in his official capacity, and the relief Plaintiffs seek extends to all of his successors and to all of the employees, officers and agents of the DOD.

14.     Defendant Daniel S. Goldin is the Administrator of NASA.  NASA, along with DOD and GSA, is responsible for promulgating the FAR and published the contested rule in the *Federal Register*.  Administrator Goldin is sued in his official capacity, and the relief Plaintiffs seek extends to all of his successors and to all of the employees, officers and agents of NASA.

15.     Defendant Kenneth J. Oscar is the Acting Deputy Administrator of, and presently the most senior official at, the Office of Federal Procurement Policy ("OFPP"), Office of Management and Budget ("OMB").  The Administrator of OFPP, along with the Secretary of Defense and the Administrators of NASA and GSA acting through their designees, comprise the "FAR Council."  The FAR Council is responsible for managing, coordinating, controlling, and monitoring the maintenance of, issuance of, and changes to the FAR, including those contained in the contested Final Rule.  Acting Deputy Administrator Oscar is sued in his official capacity, and the relief Plaintiffs seek extends to all of his successors and all future Administrators of OFPP, and to all of the employees, officers and agents of OFPP.

16.     Defendant Jacob J. Lew is Director of the Office of Management and Budget ("OMB").  The Director of OMB is responsible for approving or disapproving any new information collection requirement and, in this case, for approving the inclusion of new certification requirements, which are not specifically imposed by statute. Director Lew is sued in his official capacity, and the relief Plaintiffs seek extends to all of his successors and to all of the employees, officers and agents of OMB.

## IV.
## JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201-2202, and 5 U.S.C. §§ 611 and 702.

18.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e).

## V.
## LEGAL BACKGROUND

A.     **The Federal Acquisition Regulation**

19.     The FAR, which is published in Chapter 1 of Title 48 of the Code of Federal Regulations, is a "single, Government-wide procurement regulation" that prescribes the "uniform policies and procedures for acquisition by all federal agencies."  41 U.S.C. § 421(c)(1); FAR § 1.101.  The FAR is jointly issued and maintained by three agencies – GSA, DOD, and NASA – pursuant to their respective general authority to conduct procurement.  *See* 41 U.S.C. § 421(c)(1); FAR § 1.103(b).

20.     In addition to conferring joint authority to promulgate the FAR to these three agencies, Congress has established the FAR Council, which is authorized to "assist in the direction and coordination of Government-wide procurement policy and Government-wide

procurement regulatory authorities in the Federal Government." *Id*. § 421(a).  The FAR Council

is comprised of four members:  the Secretary of Defense and the Administrators of GSA, NASA,

and OFPP.  *See id*. § 421(b)(1).  The FAR Council is specifically authorized by Congress to

"manage, coordinate, control, and monitor the maintenance of, and issuance of and changes in,

the [FAR]."  *Id*. § 421(f).

      21.     Under of the OFPP Act, changes to procurement policies and regulations,

including the FAR, must be published in the *Federal Register* prior to enactment, and must be

subject to a "public comment period for receiving and considering the views of all interested

parties."  According to the Act, the period for comments must last for at least 30 days, or 60 days

in the case of a regulation that is expected to have "a significant cost or administrative impact on

contractors or offerors . . . ."  41 U.S.C. § 418b.  In this case, the FAR Council initially published

the proposed rule in the *Federal Register* on July 9, 1999, and invited public comment for a

period of 120 days.  The June 2000 proposed rule invited public comment for 60 days.

**B.**      **FAR Part 9: Contractor "Responsibility"**

      22.     Congress has prescribed that federal agencies may only award contracts to

"responsible source[s]."  41 U.S.C. § 253b(c), (d)(3).  A "responsible source" is a prospective

contractor who:

      (A)    has adequate financial resources to perform the contract or
             the ability to obtain such resources;

      (B)    is able to comply with the required or proposed delivery or
             performance schedule, taking into consideration all existing
             commercial and Government business commitments;

      (C)    has a satisfactory performance record;

      (D)    has a satisfactory record of integrity and business ethics;

      (E)    has the necessary organization, experience, accounting and
             operational controls, and technical skills, or the ability to
             obtain such organization, experience, controls, and skills;

(F)   has the necessary production, construction, and technical equipment and facilities, or the ability to obtain such equipment and facilities;  and

(G)   is otherwise qualified and eligible to receive an award under applicable laws and regulations.

*Id.* § 403(7).

23.    The purpose behind the Government's examination of a contractor's responsibility is to determine whether a contractor has the general ability to perform a specific contract.  *See* FAR § 9.103(c).  To carry out this mandate, FAR Part 9, "Contractor Qualifications," sets forth policies, standards and procedures governing agency evaluations of contractor responsibility.  Notably, contracting officers ("COs") must make an affirmative determination of a contractor's responsibility in *every* contract award.  FAR § 9.103.

24.    To guide COs in making these determinations, FAR section 9.104-1 identifies seven criteria that a prospective contractor must meet to be deemed responsible, which mirror the seven statutory criteria in 41 U.S.C. § 403(7).  The fourth of these responsibility criteria -- whether a prospective contractor has "a satisfactory record of integrity and business ethics," FAR § 9.104-1(d) -- is the criterion amended by the Final Rule.

**C.    FAR Part 31: The "Allowability" of Contract Costs**

25.    Unlike FAR Part 9, which pertains to the evaluation of prospective contractors before the award of any contract, FAR Part 31 addresses the very different issue of contract administration.  FAR Part 31 generally identifies contract cost principles and procedures that govern the recovery of costs by companies performing "cost reimbursement" contracts.  Under these contracts, the contractor agrees to perform in exchange for receiving reimbursement for its allowable costs, plus some additional fee (to enable it to generate a profit).

26.     Not all of a contractor's costs under a federal contract may be recovered from the Government.  Instead, the FAR provides that a contractor's costs are allowable only "to the extent they are reasonable, allocable [to the contract], and determined to be allowable," under specified provisions of FAR Subpart 31.2, including FAR § 31.205.  FAR § 31.204(a).  FAR § 31.205 prescribes forty-eight cost principles, each addressing a particular category of costs.

27.     Two of the FAR § 31.205 provisions were amended by the Final Rule.  First, the Final Rule amended FAR § 31.205-21, which governs the recovery of "Labor relations costs."  Second, it revised FAR § 31.205-47, which governs the recovery of "Costs related to legal and other proceedings."

## VI.
## FACTUAL BACKGROUND

A.     **Genesis Of The Final Rule.**

28.     On February 18, 1997, in an address to the AFL-CIO winter meeting, Vice President Gore announced that he would seek to amend the FAR to require the Government to consider a company's labor relations and employment practices in deciding whether it is entitled to receive a Government contract and whether certain costs are chargeable to Government contracts.

29.     In September 1997, Vice President Gore again told an AFL-CIO gathering that "companies that bust unions don't get or keep Federal contracts.  That ought to be taken into account when they apply for Federal contracts.  And, we're working with your leadership on this and hope to make it a reality very soon."  Vice President Gore's staff and the President of the AFL-CIO claimed that these initiatives would affect hundreds of billions of dollars in annual federal procurement spending.

30.     On July 14, 1998, the House Committee on Education and the Workforce, Subcommittee on Oversight and Investigations, held an extensive hearing regarding the Administration's then-anticipated regulations. The Acting Chairman of the Subcommittee summarized the concerns of the Committee, as well as many in private industry, that the proposed regulations were "unnecessary" and "would effectively create a 'blacklist' to shut out from the yearly pool of approximately $200 billion federal dollars those contractors the administration -- and organized labor -- wanted to punish" for alleged violations of labor laws, without any due process protections.

31.     Seven witnesses testified at this hearing -- including the Controller and Acting Deputy Director for Management at OMB, the lone witness supporting the proposed regulations. When asked to explain the problem that the proposed regulations were aimed at addressing, he was unable to provide a meaningful response. Five other witnesses, including Karen Hastie Williams, the former Administrator of OFPP during the Carter administration, testified in strong opposition to these regulations, raising numerous objections. Following OMB's remarks, one witness remarked that "there does seem to be an absence of a problem to be addressed by these proposed regulations."

**B.     Publication Of The July 1999 Proposed Rule.**

32.     Despite strong public opposition, the FAR Council published a proposed rule in the *Federal Register* on July 9, 1999. 64 Fed. Reg. 37,360 ("July 1999 proposed rule"). The July 1999 proposed rule included two major components. First, it would have required, in every procurement, that individual COs determine whether there was "persuasive evidence of the prospective contractor's lack of compliance with tax laws, or substantial noncompliance with labor laws, employment laws, environmental laws, antitrust laws or consumer protection laws."

*Id.* at 37,361.  Second, it would have modified two FAR cost principles by disallowing (a) costs incurred in connection with a legal proceeding brought by a Government entity, if there was "a finding that the contractor violated a law or regulation," and (b) "[c]osts incurred for activities related to influencing employees' decision regarding unionization." *Id.*

33.     More than 1,500 parties submitted comments on the July 1999 proposed rule, many of which strongly objected to the proposed amendment to FAR Parts 9 and 31.  Each of the Plaintiffs, either directly or through the National Alliance Against Blacklisting ("NAAB") or Plaintiffs' member companies, submitted comments opposing the July 1999 proposed rule.

34.     Among the many errors contained in the proposed rule, commenters pointed out that the proposed changes to FAR Part 9 were invalid because the rule was not subject to detailed analyses of its costs and benefits, as required by statute and Executive Order; that it exceeded the FAR Council's delegated rulemaking power, conflicted with existing statutes and remedial schemes, and improperly usurped Congressional authority to make laws; that it was unconstitutionally vague and would violate contractors' due process rights; and that it would frustrate the goals of procurement reform which are designed to make the procurement process less burdensome.  Commenters also pointed out that the proposed changes to FAR § 31.205-47 were inconsistent with the provisions of the Major Fraud Act regarding recovery of legal fees; and that the amendments to FAR § 31.205-21 would violate the Government's stated policy of neutrality in labor-management disputes.

35.     The July 1999 proposed rule was the subject of extensive bipartisan criticism from more than forty-five federal legislators.  In at least five separate letters to the FAR Council, Democratic and Republican Senators and Representatives voiced strong objections to, and urged the withdrawal of, the proposed rule.  Indeed, one letter called the proposed rule an "effort to

politicize the federal procurement process." The legislators contended that the amendments are "unfair, unnecessary, and without technical merit," citing numerous infirmities.

36.     A number of federal procurement officials also expressed concerns regarding the July 1999 proposed rule. For example, the Environmental Protection Agency ("EPA") and Small Business Administration ("SBA") objected to (1) the vagueness of the proposed "persuasive evidence" standard; (2) the "huge workload burden" imposed by the rule on COs; (3) the necessary "establishment of communication and coordination channels between Federal agencies to facilitate the process"; and (4) "the Administration's failure to account for the impact of the proposed rule on small businesses," through an Initial Regulatory Flexibility Analysis ("IRFA"), as required by the RFA. EPA, in addition, raised due process concerns, stating that "the evaluation of persuasive evidence is currently and appropriately a part of the suspension and debarment process, where formal procedures are in place, and the contractor's rights are protected."

**C.     Publication Of The June 2000 Proposed Rule.**

37.     In response to this storm of criticism, the FAR Council published a revised version of the proposed rule in the *Federal Register* on June 30, 2000. 65 Fed. Reg. 40,830 (2000) ("June 2000 proposed rule"). Although it reflected some changes from the previous version, the June 2000 proposed rule retained many of the flaws apparent in the prior version, and introduced several new flaws.

38.     First, the June 2000 proposed rule sought to revise the integrity and business ethics responsibility criterion to require a contractor to "[h]ave a satisfactory record of integrity and business ethics *including satisfactory compliance with federal laws including tax laws, labor and employment laws, environmental laws, antitrust laws, and consumer protection laws.*"

- 15 -

39.    To achieve this goal, the June 2000 proposed rule instructed COs that they "may consider all relevant credible information" in examining a contractor's compliance with this criterion. While such evidence could include convictions or civil judgments, the proposed rule also stated that it could include allegations falling short of final adjudication, such as "complaints issued by any Federal agency, board, or commission . . . ."

40.    The June 2000 proposed rule also introduced two mandatory certification provisions, one for inclusion in all solicitations expected to exceed $100,000 and one for solicitations for the acquisition of commercial items. Under these proposed certifications, contractors would have been required to certify, with respect to any Federal tax, labor and employment, environmental, antitrust, or consumer protection law, whether over the prior three years (a) they had been convicted of any felonies (or had any felony indictment pending against them); (b) had any adverse court judgments in civil cases against them; or (c) been found by a Federal Administrative Law Judge, Federal Administrative Judge, agency, board or commission to have violated such laws. If the contractor answered affirmatively to any of these questions, the proposed certifications would have required it to "explain the nature of the violation and whether any fines, penalties, or damages were assessed."

41.    Finally, the June 2000 proposed rule also significantly changed the amendments proposed to Part 31. With respect to FAR § 31.205-21, the FAR Council acknowledged that the earlier proposal was too vague, and could "lead[] to difficulty in identifying the[] types of costs" that would be rendered unallowable by the Final Rule. Therefore, the June 2000 proposed rule suggested that a contractor's costs would be disallowed if incurred to "assist, promote, or deter unionization." With respect to FAR § 31.205-47, the June 2000 proposed rule was altered to provide that legal costs incurred in a "civil or administrative proceeding" are unallowable where

there is an ultimate "finding that the contractor violated, or failed to comply with, a law or regulation." *Id.* This would be so regardless of whether the case involved allegations of fraud.

42.     Procedurally, the FAR Council stated that it did not regard the rule as a "significant rule" (which is defined as a regulatory action likely to have "an annual effect on the economy of $100 million or more") subject to OMB review under Executive Order 12866 ("EO 12866"). As a result of its determination that the rule was not a significant regulatory action, the FAR Council did not conduct a detailed cost-benefit analysis, as required by EO 12866, for the proposed rule. Consequently, the FAR Council also failed to submit a cost-benefit analysis, along with an assessment of the costs and benefits of any reasonably feasible alternatives and an explanation as to why the proposed action is preferable to the potential alternatives, to the Office of Information and Regulatory Affairs ("OIRA"), an entity within OMB, for further review.

43.     The FAR Council also stated that "[i]t also does not regard this rule as a major rule under 5 U.S.C. § 804," meaning it is not likely to result in an annual effect on the economy of $100 million or more. 65 Fed. Reg. at 40,831. As a result of this determination, the FAR Council escaped its obligation under the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), 5 U.S.C. §§ 801-808, to submit the Final Rule and any related cost-benefit analysis to the Comptroller General for further review.

44.     With regard to the RFA, the FAR Council stated that it had prepared an IRFA for the June 2000 proposed rule, which it claimed "supports a conclusion that this rule would not likely have a significant economic impact on a substantial number of small entities." Although the FAR Council determined that approximately 171,000 small entities would be affected by the Rule, it concluded that the proposed rule would not have a significant economic impact on a substantial number of small entities. Finally, although the proposed rule imposed new

- 17 -

certification requirements, the FAR Council provided no analysis of the burden those certifications would impose on small entities or of the professional skills required to prepare the certifications.

**D.    Opposition To The June 2000 Proposed Rule.**

45.    More than three hundred comments were submitted on the June 2000 proposed rule, including numerous negative comments from government contractors and federal contracting agencies.  Each of the Plaintiffs, either directly, by participation in comments submitted by NAAB, or through the comments submitted by member companies, submitted comments on the June 2000 proposed rule.

46.    Commenters again highlighted the procedural and substantive flaws in the revised proposed rule, explaining that the changes to FAR Parts 9 and 31 that were spelled out in the June 2000 proposed rule, like those in the abandoned 1999 version, were arbitrary, capricious, an abuse of discretion, and contrary to law for numerous stated reasons.

47.    In particular, commenters highlighted the FAR Council's lack of a rational basis for the rule; its failure to evaluate the costs and benefits of the rule, and its impact on small businesses, as required by statute and Executive Order; the Council's encroachment on Congressional lawmaking authority; the Rule's failure to define adequately the prohibited conduct and its failure to afford contractors minimal due process; the Rule's conflict with existing rules regarding suspension and debarment; and the Rule's conflict with procurement reform initiatives mandated by law.

48.    Commenters also challenged the proposed changes to Part 31, arguing that the changes to FAR § 31.205-47 would, *inter alia*, violate the Major Fraud Act of 1988. Commenters also argued that the changes to FAR § 31.205-21 were contrary to, and would

conflict with, other FAR cost principles and would contravene the Government's obligation to be impartial and neutral on labor relations issues.

49.     Interested parties, including Plaintiffs, also submitted comments identifying numerous legal infirmities in the FAR Council's attempts to comply with the mandates of (a) the RFA, which requires an analysis of the proposed rule's impact on small business; as well as (b) the PRA, which requires an analysis of the record-keeping burden imposed by a collection of information such as the proposed rule's required certifications.  With regard to the PRA, at least one commenter pointed out that the FAR Council had made available to the public two wildly different estimates of the burden imposed by the rule -- one of which estimated an annual impact on the economy of more than $679 million and another (upon which the Council purportedly relied as justification for the rule) indicating a drastically reduced estimate of approximately $98.6 million.

50.     As with the July 1999 proposed rule, the June 2000 proposed rule was also the subject of bipartisan opposition from federal legislators.  In addition to voicing many of the same concerns they had raised in response to the July 1999 proposed rule, legislators addressed several other issues, including:  the FAR Council's failure to articulate any rational need for the Rule; its continued failure to conduct an appropriate analysis of the impact on small businesses (contrary to the requirements of the RFA); and the failure to protect contractors' rights to due process.

51.     In addition, a number of agencies filed formal comments opposing the proposed rule.  GSA, one of the three federal agencies that share delegated authority by Congress to prepare, issue and maintain the FAR, *see* FAR § 1.103(b), submitted comments which strongly objected to adoption of the 2000 proposed rule:

GSA strongly opposes the revised proposed changes to the FAR. GSA has two fundamental objections to the proposed rule. First, contracting officers (CO) and other members of the acquisition team will find implementation of the proposed rule extremely difficult. Such difficulties will include:

- inconsistent application of the language in the rule,
- additional cost to the Government not covered by current appropriation or existing budgets, and
- additional time and effort expended on the acquisition process.

The proposed rule, if implemented, will undermine the progress the Government has made in acquisition reform and streamlining. Second, the proposed rule will discourage commercial companies from selling to the government.

\*\*\*

[I]n the absence of sufficient guidance on how to treat violations in the host of areas concerned, it is highly likely that disparate determinations will be made concerning the same, or similar, information leading to different treatment of the same contractor by different contracting officers. This disparate treatment will lead to additional litigation as the contractors try to understand why they are being treated differently by the government.

\*\*\*

While many decisions or determinations rely on CO's judgment, such as best value, GSA believes that CO's do not have the requisite training and expertise in the areas contemplated in the proposed rule.

\*\*\*

GSA agrees with prior public comments that found the rule punitive. . . . The goals of the proposed rule could be better met simply by following the procedures already established for suspensions and debarments . . . and by improved communication between the agencies regarding suspended and debarred contractors.

52.     EPA submitted comments bluntly advising the FAR Council that "we do not

support the regulatory changes as presented in the [2000] proposed rule" and "find the proposed

rule to be seriously flawed, and we recommend that it not be made final." The agency stated that

it had "broad philosophical objections to the proposed rule," as well as numerous specific

criticisms. EPA's criticisms, like GSA's, focused on the likelihood that the 2000 proposed rule

would lead to inconsistent decisions, the lack of adequate due process safeguards, and the

absence of any need for the proposed rule given the existence of debarment proceedings:

> In our comments on the previous draft rule we noted the strong potential of the rule to trigger multiple inconsistent decisions by contracting officers scattered throughout the Government based on their assessment of business honesty or integrity. The potential for inconsistent decisions based on the same facts is significant. Further, determinations of non-responsibility on business integrity grounds on more than one contract may give rise to claims of de facto debarment. *The re-proposed rule does not materially resolve this concern.* When the Government denies a firm a contracting opportunity on grounds relating to business integrity and honesty, there must be safeguards for procedural due process, including notice of the charges and the opportunity to contest, and a decision based on the record in order to minimize the Government's vulnerability to claims of de facto debarment. . . .

> The proposed rule encourages (by use of the word should) but does not require contracting officers to coordinate with agency counsel on all non-responsibility determinations based upon integrity and business ethics. This could serve to increase the potential for inconsistent application of integrity and business ethics criteria. Even if counsel is consulted, different agencies may, nevertheless, make inconsistent determinations based on the same information. . . .

> ***

> The publication of this rule will create potentially serious conflicts and legal challenges. The rule is silent as to what effect a prior decision by a Federal debarring official under the Government-wide debarment system will have on the obligations of contracting officers in making responsibility determinations. Similarly, what impact will a contracting officer's decision have on the potential for initiating action under the Government-wide debarment regulations? *These questions should be thoroughly examined and addressed before a rule of this nature is published.*

53.    No federal agency submitted comments in favor of the June 2000 proposed rule.

54.    Finally, statements during and after the formal comment period by GSA, DOD, and NASA -- the three agencies statutorily authorized to promulgate the FAR -- demonstrated quite remarkably that senior procurement officials at all three agencies strongly opposed the adoption of the final regulation.  The Defense Acquisition Regulations ("DAR") Council -- the body that represents the interests of DOD and NASA with regard to amendments to the FAR -- submitted a memorandum to DOD's representative on the FAR Council expressing its strong opposition to the June 2000 proposed rule and urging the FAR Council to withdraw its proposed amendments to FAR Parts 9 and 52.

**E.    The December 20, 2000 Final Rule.**

55.    On December 20, 2000, the Final Rule was published in the *Federal Register*. The Final Rule contained many of the same errors that were found in the earlier versions, as well as several new and significant errors.

56.    While the June 2000 proposed rule advised COs that they "*may consider*" all relevant and credible information regarding prospective contractors' compliance with "federal law," the Final Rule mandates that COs "*must consider* all relevant and credible information" to determine contractor's "compliance with *the law*."  As the preamble to the Final Rule published in the *Federal Register* illustrates, this change has significantly expanded the scope of the responsibility inquiry to include, for the very first time, violations of foreign law, as well as civil complaints by private parties:

> Although the final rule establishes a hierarchy of violations of law, some of which are also referenced in the certification, the [CO] is not limited to considering only the listed violations. . . .  [A] prospective contractor's record of compliance with *foreign laws*

*and regulations can also constitute "relevant credible information."*

\* \* \*

The fact that administrative complaints, private civil cases, and violations of foreign law have not been included in the certification, however, does not mean that they cannot be taken into the [CO's] consideration . . . to the extent that the [CO] becomes aware of such cases, and they constitute "relevant and credible information," the [CO] *must* consider them . . . . (emphasis added).

57.     The Final Rule (like the June 2000 proposed rule) contains the following "hierarchy" of offenses related to tax, labor and employment, environmental, antitrust, or consumer protection laws, that COs must consider in determining responsibility:

- Federal or state felony convictions;
- adverse Federal court judgments in civil cases brought by the United States;
- adverse decisions by a Federal administrative law judge, board, or commission indicating violations of law; and
- other relevant information such as civil or administrative complaints of similar actions filed by or on behalf of a federal agency, board or commission, if such action reflects an adjudicated determination by the agency.

58.     The Final Rule also contains revised certifications that, again, apply to all procurements over $100,000, and to all procurements of commercial items, regardless of dollar value.  Under both certifications, contractors must certify that, with respect to tax, labor and employment, environmental, antitrust, or consumer protection laws, the offeror has not in the past three years

- been convicted of a Federal or state felony (or has any Federal or state felony indictments currently pending against them); or
- had a Federal court judgment in a civil case brought by the United States rendered against them; or

- had an adverse decision by a Federal administrative law judge, board, or commission indicating a willful violation of law.

Under both certifications, the contractor is required to provide additional information "if requested by the Contracting Officer."

59.     While the FAR Council acknowledged receiving comments that the proposed rule impinged on contractors' rights to due process, the Final Rule does not provide contractors with prior notice or an opportunity to be heard before being subjected to a determination of non-responsibility.  Instead, the Rule provides that contractors will be notified only after they have been eliminated from a competition for a perceived lack of integrity and business ethics.

60.     With respect to Part 31, the Final Rule remains unchanged from the June 2000 proposed rule -- even though comments were submitted by interested parties highlighting the weaknesses in the earlier (unchanged) proposed rule.  In fact, in issuing the Final Rule, the FAR Council failed even to address the comments it received regarding the changes to Part 31.

61.     In support of the Final Rule, the FAR Council has issued its third analysis of the paperwork burden associated with the FAR Part 52 certification provisions.  Although the Council had originally estimated that the certifications would impose a total annual cost of more than $679 million, the Council now estimates that the total annual cost impact will be only $98 million.  This, despite the fact that the FAR Council acknowledged for the first time in its Final Rule that contractors will incur significant costs implementing new systems to track compliance with the myriad laws encompassed by the Final Rule, so that they may accurately complete the certifications included in the Final Rule and respond to COs' requests for additional information.

62.     Apparently relying on this flawed PRA analysis, the FAR Council stated that it did not regard the Final Rule as a "significant rule" subject to OMB review under EO 12866, and

thus did not prepare a cost-benefit analysis. The FAR Council also asserted once more that it does not regard the Final Rule as a "major rule" under SBREFA. Accordingly, the FAR Council did not submit a cost-benefit analysis to the Comptroller General, and the Comptroller General did not review the FAR Council's compliance with various RFA requirements.

63.    Finally, rather than prepare a Final Regulatory Flexibility Analysis, the FAR Council simply certified that the Final Rule will not have a significant economic impact on a substantial number of small entities -- even though it determined that the Rule will affect 171,000 small entities, and that contractors are likely to incur additional costs in implementing new systems to track compliance with the limitless laws encompassed by the Final Rule and its required certifications.

## VII.
## CAUSES OF ACTION

### Count 1
### The Amendments To FAR Parts 9 And 52 Are Arbitrary, Capricious, An Abuse of Discretion, Contrary to Law, And Exceed Statutory Authority

**A.    The Amendments To FAR Parts 9 And 52 Lack A Rational Basis.**

64.    Paragraphs 1 through 63 are incorporated by reference as if set forth fully herein.

65.    A fundamental tenet of administrative law is that agencies must conduct rulemaking in a rational manner. This requires, at a minimum, that an agency promulgate regulations only when the new regulation will serve a beneficial purpose. In addition to, and consistent with, this tenet, FAR § 1.102-2(b) directs that amendments to the FAR should be promulgated only when their benefits clearly exceed the costs of their development, implementation, administration, and enforcement.

66.     The FAR Council stated in both proposed rules and the Final Rule that the amendments to FAR Part 9 are necessary to "clarify" for COs and contractors the existing FAR definition of responsibility.  In addition, the Council claims that, because of a "lack of guidance," government CO's "are extremely reluctant, absent clear guidance, to exercise their discretion in making this determination" of non-responsibility.

67.     Despite this claim, the FAR Council has not identified any concrete evidence that COs and other government procurement officials (or contractors) require a clarification of the "integrity and business ethics" criterion, or that COs have been unable to apply the existing standards for determining contractor responsibility.  To the contrary, COs and career government procurement officials have expressed vehement opposition to this purported clarification, as reflected in the public comments submitted by SBA, GSA and EPA, and the written opposition submitted to the FAR Council by the DAR Council on behalf of DOD and NASA.  The FAR Council's assertion that the Final Rule is necessary to "clarify" the language of FAR subpart 9.1 is without foundation.

68.     In fact, the Final Rule does not effect a clarification; it imposes a dramatic change in the FAR.  The Final Rule has significantly expanded the scope of the responsibility inquiry to encompass compliance with "the law" -- a change which requires COs to consider *any* relevant and credible information they receive regarding compliance with violations of federal and state laws or regulations, as well as violations of foreign law and even civil complaints by private parties.  Moreover, the Final Rule *mandates*, for the first time ever, that COs examine contractor compliance with all laws and regulations in *every* responsibility determination.

69.     By expanding the responsibility inquiry to include all federal and state laws – and, for the first time, foreign laws – even if they have nothing to do with procurement, the Final Rule

- 26 -

arbitrarily eliminates any nexus between the "integrity and business ethics" criterion and the ability of the contractor to perform a particular government contract. This is especially so, given that the Final Rule does not even require that any legal violation or alleged violation must involve intent to be considered in a CO's responsibility determination.

70.     Moreover, the Final Rule requires COs to have an understanding of all laws or regulations, and the training and ability to apply many highly complex laws or regulations to the alleged facts. Therefore, implementing the Final Rule will require a level of expertise and knowledge that very few, if any, COs -- not to mention the agency attorneys they are encouraged to coordinate with -- possess. In fact, in commenting on the Final Rule, various federal agencies whose COs will be forced to administer the Final Rule -- including DOD, GSA and EPA -- asserted that COs lack the requisite training and expertise needed to implement the rule.

71.     Because COs lack the necessary expertise in each of the areas of law covered by the Final Rule, effective implementation of the Final Rule will require a mechanism for COs to coordinate and communicate with the responsible agencies in each of these areas of law, in order to determine whether a particular violation of law should be deemed to impact on the contractor's responsibility. In issuing the Final Rule, and in analyzing the costs of implementing the Final Rule, the FAR Council completely ignored such concerns regarding COs' lack of necessary expertise or resources.

72.     Furthermore, by dictating that agencies "must consider" all relevant and credible information "that the contracting officer becomes aware of" -- including, as the FAR Council's summary declares, "administrative complaints, private civil cases, and violations of foreign law" -- the FAR Council has also opened up the process of responsibility determinations to outside influence and interference by third parties. As a result, outside parties -- including, for example,

unions, environmental groups, competitors, disgruntled former employees, and consumer "activists" – can use the process to retaliate against a particular contractor or to advance their own agendas, thereby threatening the integrity of the procurement process. Again, COs will face the unreasonable and unmanageable burden of evaluating whether such information constitutes "relevant and credible information" and whether it rises to a level that affects the contractor's "responsibility."

73.     The Final Rule also immediately imposes an enormous burden on contractors, as well as federal agencies, to devote significant resources to comply with the Rule's required certifications. As the FAR Council explicitly recognized, "most large businesses and some small businesses will probably establish a new system or augment a current system to track such compliance." In addition to these private costs, the Government itself will be required to devote time and resources to gathering, reviewing and evaluating "all relevant and credible information" regarding the myriad laws covered in the Final Rule. According to the Government's own estimates -- which are themselves understated -- these total costs will range from $98 million to more than $679 million per year.

74.     Despite these enormous costs, the FAR Council has remained unable, throughout this rulemaking, to define any valid beneficial impact of the Final Rule. The sole justification offered by the FAR Council – that the Final Rule "clarifies" the integrity and business ethics criterion – is belied by the comments of the Government's own procurement officials, federal agencies (including GSA), and the DAR Council. The FAR Council's issuance of a rule that imposes significant burdens, with no determination of any corresponding benefits, is patently arbitrary, capricious and irrational.

75.    In sum, in issuing the Final Rule, the FAR Council has ignored the concerns of government's own procurement professionals regarding the need for and implementation of the Rule; required COs to deny contracts for violations of law that have no rational relation to a contractor's integrity or ethics, or its ability to perform a particular contract; opened up the process of determining responsibility to politically motivated outside influence and interference; and imposed enormous burdens on contractors and government personnel, with no demonstrable corresponding benefit.  As a result, the Final Rule is arbitrary, capricious, and an abuse of discretion.

**B.    The FAR Council Has Exceeded its Statutory Authority Under its Enabling Statutes and Under the Statutes Purportedly Being Implemented.**

76.    Paragraphs 1 through 75 are incorporated by reference as if set forth fully herein.

77.    The Final Rule cites three statutory bases:  (a) 40 U.S.C. § 486(c); (b) 10 U.S.C. chapter 137; and (c) 42 U.S.C. § 2473(c).  *See* 65 Fed. Reg. at 80,264.  These enabling statutes only authorize the FAR Council to promulgate regulations to implement various procurement statutes.  The proposed rule also cites as a legal basis two statutes, 10 U.S.C. § 2305(b) and 41 U.S.C. § 253b, which require the Government to award a contract only to a "responsible source"; and a third statute, 41 U.S.C. § 403, which defines a "responsible source" as a prospective contractor that demonstrates, *inter alia*, a "satisfactory record of integrity and business ethics."

78.    None of these statutes grants the FAR Council any authority to issue regulations that effectively amend all laws, especially tax, environmental, labor and employment, antitrust, and consumer protection laws, to add disqualification from federal contracting as a remedy for violations of those laws, where Congress has chosen not to impose that remedy.  Indeed, Congress has only authorized the denial of federal contracts (debarment) as a remedy for certain

violations of laws implicated by the Final Rule, including: the Davis-Bacon Act, 40 U.S.C. §

276a-2(a) (debarment remedy for violations of labor and employment law); Buy American Act,

41 U.S.C. § 10b(b) (debarment remedy for violations of consumer protection law); Walsh-

Healey Act, 41 U.S.C. § 37 (debarment remedy for violations of labor and employment law);

Service Contract Act, 41 U.S.C. § 354(a) (debarment remedy for violations of labor and

employment law); Drug-Free Workplace Act, 41 U.S.C. § 701(b) (debarment remedy for

violations of labor and employment law); Clean Water Act, 33 U.S.C. § 1368(a) (debarment

remedy for violations of environmental law); and Clean Air Act, 42 U.S.C. § 7606(a) (debarment

remedy for violations of environmental law).

     79.    In contrast, Congress has not chosen to make ineligibility for federal contracts a

remedy for violations of the limitless other laws implicated by the Final Rule. For example, for

more than thirty years Congress has repeatedly rejected numerous legislative proposals to grant

the Department of Labor specific authority to deny federal contracts for violations of (i) the

National Labor Relations Act, 28 U.S.C. § 151 *et seq.*; (ii) the Fair Labor Standards Act of 1938,

29 U.S.C. § 201 *et seq.*; (iii) the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*;

and (iv) Section 4212(a) of Title 38, United States Code (Vietnam veterans). In addition, in

Title VII of the Civil Rights Act of 1964, the principal federal employment discrimination law,

Congress specifically withheld debarment from government contracts as a penalty for the

authority of "any agency or officer of the United States under any equal employment opportunity

law or order" where an appropriate affirmative action plan is in place. 42 U.S.C. § 2000e-17.

     80.    The existing statutory remedies for violations of these and other laws reflect a

carefully considered and delicate balance enacted by Congress in determining whether and when

a violation of a particular law warrants the denial of federal contracts. By directing individual

COs to deny federal contracts for violations of the numerous laws whose interpretation,

administration, and enforcement are entrusted to other federal agencies, and for which Congress

has not chosen to enact such a penalty, the FAR Council has acted arbitrarily, unlawfully and "in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C.

§ 706(2)(c).

      81.     Moreover, none of the statutes relied upon by the FAR Council as authority for

the Final Rule grants the Council any authority to issue implementing regulations to enforce or

interpret tax, environmental, labor and employment, antitrust, or consumer protection laws.

Instead, Congress has delegated these responsibilities to specific agencies, including without

limitation: the Department of Treasury, 26 U.S.C. § 7801(a) (tax); the National Labor Relations

Board ("NLRB"), 29 U.S.C. §§ 156, 160 (labor); the Department of Labor, *e.g.,* 29 U.S.C.

§§ 214, 216 (Fair Labor Standards Act), 29 U.S.C. §§ 651, 653, 655-659 (Occupational Safety

and Health Act); the Equal Employment Opportunity Commission, 42 U.S.C. § 2000e-5

(employment); EPA, *e.g.,* 33 U.S.C. §§ 1251(d), 1319 (Clean Water Act), 42 U.S.C. § 7413

(Clean Air Act); the Federal Trade Commission, 15 U.S.C. §§ 21, 45, 46 (antitrust and consumer

protection); and the Department of Justice, 15 U.S.C. § 4 (antitrust).

      82.     Despite these specific delegations of authority, the Final Rule dictates that

individual COs throughout the myriad agencies comprising the Executive branch "*must consider*

*all relevant credible information*" regarding contractors' compliance with, *inter alia*, the

enumerated areas of law -- including "administrative complaints" and "private civil cases."

Because this requires COs to determine compliance with various laws, based on less than a full

and formal adjudication by the responsible enforcement agency or a court of competent

jurisdiction, COs must interpret and enforce laws that have been entrusted to these specific

agencies.  Accordingly, the Final Rule is arbitrary, unlawful and "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(c).

**C.     The FAR Council Impermissibly Denied Plaintiffs the Opportunity to Comment
on Amendments Regarding Compliance with State and Foreign Laws.**

83.     Paragraphs 1 through 82 are incorporated by reference as if set forth fully herein.

84.     The July 1999 proposed rule informed interested parties that the FAR Council

proposed amending FAR Part 9 to authorize COs to consider a prospective contractor's non-

compliance with federal tax, labor, employment, environmental, antitrust, or consumer protection

laws.  The preamble to the proposed rule explained:  "A prospective contractor's record of

compliance with laws and regulations promulgated by the *Federal* Government is a relevant and

important part of the overall responsibility determination."

85.     The June 2000 proposed rule sought to amend FAR Part 9 to state that

"satisfactory compliance with *federal* laws including tax laws, labor and employment laws,

environmental laws, antitrust laws, and consumer protection laws would be part of a satisfactory

record of integrity and business ethics."  65 Fed. Reg. at 40,830.  It further stated:  "The

objective of the proposed rule is to make it clear that the contracting officer should consider

violations of *federal* law in determining whether a prospective contractor has an unsatisfactory

record of integrity and business ethics."  *Id*. at 40,832.

86.     The June 2000 proposed rule, if adopted as written, would have amended FAR

Part 52 to require contractors to certify whether they had been "convicted of any felonies" or

"had any adverse court judgments in civil cases against them" arising from "any *Federal* tax,

labor and employment, environmental, antitrust, or consumer protection laws," and whether they

had been found by a federal judge, agency, board or commission to have violated "any *Federal*

tax, labor and employment, environmental, antitrust, or consumer protection laws." *Id*. at 40,831

(emphasis added).

87.    In contrast, the Final Rule amends FAR Part 9 to require a "satisfactory record of

compliance with *the law*." The preamble to the Final Rule informs contractors, for the first time,

that the rule requires COs to consider a contractor's compliance with "State laws" and "foreign

laws and regulations." The preamble states that the FAR Council departed from the June 2000

proposed rule in response to several comments submitted on the June 2000 proposed rule. The

Final Rule also states that "the final certification has been broadened to include violations of

State felony law as well as Federal law" relating to tax, labor and employment, the environment,

antitrust and consumer protection.

88.    The FAR Council failed to provide any notice that either FAR Parts 9 or 52 would

be amended to include consideration of a contractors' compliance with state or foreign laws and

regulations. Thus, Plaintiffs and other interested parties were denied any opportunity to provide

comments on the inadvisability of extending the reach of FAR Part 9 to include consideration of

their compliance with these additional laws and regulations, or of broadening the FAR Part 52

certification provisions to require certifications regarding compliance with state felony laws.

89.    Because the Final Rule is not a logical outgrowth of either the July 1999 proposed

rule or the June 2000 proposed rule, the FAR Council has failed to comply with the notice and

comment provisions of the Office of Federal Procurement Policy Act ("OFPPA"), 41 U.S.C.

§ 418b. Consequently, the Final Rule was promulgated without observance of procedure

required by law and cannot be afforded any force and effect.

**D.    The Final Rule Unlawfully Deprives Contractors Of Procedural Due Process.**

90.    Paragraphs 1 through 89 are incorporated by reference as if set forth fully herein.

91.    An agency's stigmatizing determination that a contractor lacks a satisfactory record of business integrity involves a liberty interest protected by the Fifth Amendment to the United States Constitution.  Accordingly, agencies must afford a contractor procedural due process *before* taking the adverse action of making a final determination that the contractor possesses an unsatisfactory record of integrity or ethics.

92.    Under the Final Rule, COs are not required to notify contractors prior to a finding of nonresponsibility.  Instead, in negotiated procurements, which are governed by FAR Part 15, COs are required to "promptly notify" a contractor of a non-responsibility determination only *after* the contractor is eliminated from the competitive range or otherwise eliminated from the competition.  65 Fed. Reg. at 80,265.  In sealed bid procurements, which are governed by FAR Part 14, the Final Rule directs COs to "promptly notify" a low bidder of a non-responsibility determination only *after* the bidder's bid is rejected.  *Id.*

93.    The Final Rule fails to provide a contractor that is determined by a federal agency to be non-responsible with any notice *before* it is found to lack a satisfactory record of ethics and business integrity.

94.    In defending this Rule, the FAR Council stated in its preamble to the Final Rule that an aggrieved contractor's only available means of challenging a non-responsibility determination is (a) "by filing suit in Federal District court under the Administrative Procedure Act" or (b) "by filing a bid protest with the General Accounting Office, agency protest official, the Court of Federal Claims or the Federal District Court." *Id.* at 80,258.

95.     Neither of these avenues affords an aggrieved contractor *any* opportunity to respond to a COs finding of non-responsibility *before* the agency makes a final, stigmatizing determination that the contractor lacks integrity and business ethics.

96.     By depriving contractors of an opportunity to rebut attacks on their integrity and business ethics *before* a stigmatizing determination of a lack of integrity is made, the Final Rule offends basic notions of due process, as mandated by the Fifth Amendment to the United States Constitution.  The Final Rule is therefore arbitrary, capricious, an abuse of discretion, and contrary to law.

**E.     The Final Rule Is Unconstitutionally Vague.**

97.     Paragraphs 1 through 96 are incorporated by reference as if set forth fully herein.

98.     The range of laws that the Final Rule brings within the purview of every CO is ill-defined.  The Final Rule requires COs to determine whether a contractor has maintained a record of "satisfactory compliance with the law including tax laws, labor and employment laws, environmental laws, antitrust laws, and consumer protection laws."  65 Fed. Reg. at 80,264 (to be codified at FAR § 9.104-1(d)).

99.     The Final Rule, like the June 2000 proposed rule before it, does not provide sufficient guidance to contractors or government procurement officials, as numerous commenters pointed out -- including the government agencies responsible for applying these standards.  For example, the Final Rule does not define which federal laws are to be evaluated when determining a contractor's compliance with "tax laws, labor and employment laws, environmental laws, antitrust laws, or consumer protection laws," compliance with which contractors must certify under the Final Rule.  FAR § 9.104-3(c)(1)(iii).  Indeed, "consumer protection laws" is so vague as to be essentially meaningless.  Similarly, the Final Rule does not define the terms "satisfactory

compliance," "credible information," or "significant violations," which also are not defined elsewhere in the FAR, in other statutes or regulations, or in case law.

100.    The Final Rule also fails to provide consistent guidance.  On the one hand, the Rule imposes a certification – which is ostensibly designed to assist COs in determining responsibility – which only requires contractors to provide information regarding final adjudicated decisions that a contractor has violated specific state or federal laws.  However, the Rule also instructs COs that they must consider all relevant and credible evidence regarding the contractor's compliance with *the law* – including violations not encompassed by the certification. Even more confounding, the FAR Council's guidance instructs COs to consider additional information – including foreign law violations and civil cases – not addressed in either the certification or the body of the regulation.

101.    As a result of these and other vagaries, contractors and COs alike have virtually no notice of the scope of the laws COs will consider when determining responsibility under FAR § 9.104-3(c)(1)(iii); the sources of information that will be reviewed; or the standards upon which COs will make responsibility determinations when confronted with the various sources of evidence.  Consequently, contractors will be subject to *ad hoc*, wildly uneven responsibility determinations, from agency to agency and from CO to CO.

102.    The Final Rule is therefore unlawfully vague, in violation of the Due Process Clause of the Fifth Amendment to the Constitution.

**F.      The Final Rule's Amendment to FAR § 52.212-3 Conflicts with the Federal Acquisition Streamlining Act of 1994.**

103.    Paragraphs 1 through 102 are incorporated by reference as if set forth fully herein.

104.    The Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub. L. No. 103-

355, 108 Stat. 3243, encouraged federal agencies to procure commercial items "to the maximum extent practicable" and directed amendment of the FAR to reflect this preference and to establish regulations governing acquisitions of such items.

105.    To achieve this goal, Section 8301 of FASA amended three federal laws -- the Clean Water Act ("CWA"), 33 U.S.C. § 1368(f), the Contract Work Hours and Safety Standards Act ("CWHSSA"), 40 U.S.C. § 334, and the Clean Air Act ("CAA"), 33 U.S.C. § 7606 -- to prohibit federal agencies from requiring contractors to certify, as a condition of award in a procurement of commercial items, that they have not been convicted of an offense under these selected laws.  As a result of the FASA reforms, the CWA contains the following prohibition:

> No certification by a contractor, and no contract clause, may be required in the case of a contract for the acquisition of commercial items in order to implement a prohibition or requirement of this section or a prohibition or requirement issued in the implementation of this section.

33 U.S.C. § 1368(f)(1) (codifying Section 8301(a) of FASA).

106.    Similarly, the CWHSSA as modified by FASA provides that "[n]o certification by a contractor, and no contract clause, may be required in the case of a contract for the acquisition of commercial items in order to implement a prohibition or requirement in [Title 40, Chapter 5, Subchapter II]."  40 U.S.C. § 334(a) (codifying Section 8301(b) of FASA).

107.    Likewise, the CAA as amended by FASA contains the following prohibition against contractor certifications as a condition of award in a procurement of commercial items:

> The Federal Acquisition Regulation may not contain a requirement for a certification by a contractor under a contract for the acquisition of commercial items, or a requirement that such a contract include a contract clause, in order to implement a prohibition or requirement of section 306 of the Clean Air Act (42 U.S.C. 7606) [this section] or a prohibition or requirement issued in the implementation of that section [this section], since there is

nothing in such section 306 [this section] that requires such a
certification or contract clause.

42 U.S.C. § 7606 note (codifying Section 8301(g) of FASA).

108.    By requiring contractors to certify regarding violations of all environmental, labor

and employment laws -- laws which would encompass the CWA, CAA and CWHSSA -- in

connection with bids and proposals for commercial item contracts, the Final Rule's amendment

to FAR § 52.212-3 conflicts directly with Section 8301(a) of FASA, codified at 33 U.S.C. §

1368(f), 40 U.S.C. § 334(a), and 42 U.S.C. § 7606 note.

109.    Accordingly, the Final Rule's amendment to FAR § 52.212-3 is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).

<div align="center">

**Count 2**
**The Amendments to FAR § 31.205-47**
**Conflict with the Major Fraud Act of 1988 and Are**
**Thus Arbitrary, Capricious, an Abuse of Discretion, and Contrary To Law**

</div>

110.    Paragraphs 1 through 109 are incorporated by reference as if set forth fully herein.

111.    In 1988, Congress expressly considered the allowability of litigation costs

incurred in defense of Government proceedings, and its carefully considered compromise policy

is reflected in the Major Fraud Act of 1988 ("MFA"), Pub. L. No. 100-700, § 8, 102 Stat. 4631,

4634.  The cost allowability provisions of the MFA are codified at 10 U.S.C. § 2324(k)

(applicable to DOD) and 41 U.S.C. § 256(k) (applicable to civilian agencies).

112.    The MFA renders unallowable legal costs a contractor incurs in Governmental

proceedings if:  (1) the proceeding was criminal and resulted in a conviction; or (2) the

proceeding was civil or administrative and resulted in (a) liability where fraud or similar

misconduct is alleged, or (b) the imposition of a "monetary penalty" where fraud or similar misconduct is not alleged. 10 U.S.C. § 2324(k); 41 U.S.C. § 256(k).

113. In passing this legislation, Congress expressly concluded that costs incurred in unsuccessfully defending civil or administrative *fraud* proceedings are unallowable if the contractor is simply found liable. Importantly, however, Congress also decided that for any *other* civil or administrative proceeding, the costs are unallowable *only if* the contractor is (a) found to have violated a law, *and* (b) assessed a "monetary penalty." Critically, Congress explicitly excluded from the definition of "penalty" "restitution, reimbursement, or compensatory damages," such as backpay, which is often awarded where, for example, violations of labor and employment laws are found. 10 U.S.C. § 2324(k)(6)(c); 41 U.S.C. § 256(k)(6)(c).

114. The July 1999 proposed rule would have amended FAR § 31.205-47 to preclude contractors from recovering legal costs incurred in a civil or administrative proceeding where there is an ultimate "finding that the contractor violated a law or regulation." In response, NAAB submitted comments that pointed out that this provision "would violate the edicts of the Major Fraud Act."

115. The June 2000 proposed rule proposed a slightly altered revision to FAR § 31.205-47 that would have precluded contractors from recovering legal costs incurred in a civil or administrative proceeding where there is an ultimate "finding that the contractor violated, or failed to comply with, a law or regulation." Again, NAAB submitted comments stating that the "proposed amendment . . . violates the Major Fraud Act."

116. Despite this repeated criticism, the Final Rule retains the precise language proposed by the FAR Council in the June 2000 proposed rule. The Final Rule amends FAR § 31.205-47 to preclude contractors from recovering legal costs incurred in a civil or

administrative proceeding where there is an ultimate "finding that the contractor violated, or failed to comply with, a law or regulation." 65 Fed. Reg. at 80,265. In adopting this change in the Final Rule, the FAR Council failed to address NAAB's significant and valid criticism of the amendment to FAR § 31.205-47 and failed to provide any explanation in the Final Rule as to why this revised language does not conflict with the MFA.

117.    By removing the distinction between violations involving fraud and other violations, and by disallowing the recovery of costs in civil or administrative proceedings not involving fraud in which a contractor is found to have violated a law but which does not result in the imposition of a monetary penalty, the language of the Final Rule conflicts patently with the MFA, which represents the considered judgment of Congress.

118.    Incredibly, the Final Rule mirrors the language initially promulgated by the FAR Council in its 1989 interim rule implementing the MFA -- which the Council itself recognized in 1990 to be contrary to the MFA and corrected. In other words, by promulgating this revision to FAR § 31.205-47, the FAR Council has made the same error that it made (and subsequently corrected) a decade ago. At bottom, the amendment to FAR § 31.205-47 violates the MFA, and is thus contrary to law and is otherwise arbitrary and capricious.

### Count 3
### The Amendment To FAR § 31.205-21
### <u>Is Arbitrary, Capricious, and Contrary To Law</u>

**A.    <u>The Revision To FAR § 31.205-21 Creates An Internal Conflict.</u>**

119.    Paragraphs 1 through 118 are incorporated by reference as if set forth fully herein.

120.    The revision to FAR § 31.205-21 designates the existing language of FAR § 31.205-21 as FAR § 31.205-21(a) and promulgates a new subsection, FAR § 31.205-21(b).

This new subsection renders unallowable costs that a contractor incurs to "assist, promote, or deter unionization." 65 Fed. Reg. at 80,265. However, the language newly-designated as FAR § 31.205-21(a) continues to allow contractors to recover costs "incurred in maintaining satisfactory relations between the contractor and its employees, including costs of shop stewards, labor management committees, employee publications, and other related activities." FAR § 31.205-21 (1999).

121.    As revised by the Final Rule, FAR § 31.205-21(a) and (b) conflict. The contractor costs that were permitted under FAR § 31.205-21 prior to the Final Rule, which continue to be permitted under FAR § 31.205-21(a), are all activities that assist, if not promote, unionization. Accordingly, these costs are now unallowable under FAR § 31.205-21(b). Thus, FAR § 31.205-21, as amended by the Final Rule, is internally inconsistent. To the extent that the costs incurred in connection with activities covered under FAR § 31.205-21(a) and similar costs are deemed allowable, that would violate the Government's requirement to "remain impartial concerning any dispute between labor and contractor management." FAR § 22.101-1(b).

122.    Because the amendment to FAR § 31.205-21 creates a direct conflict between the two subsections of the cost principle, it is arbitrary, capricious, and contrary to law.

**B.      The Revision To FAR § 31.205-21 Violates The Government's Neutrality Obligation.**

123.    Paragraphs 1 through 122 are incorporated by reference as if set forth fully herein.

124.    The FAR requires agencies to "remain impartial concerning any dispute between labor and contractor management." FAR § 22.101-1(b). To achieve this end, prior to promulgation of the Final Rule, the FAR cost principles struck a balance in the area of labor relations by (a) allowing contractors to recover a properly allocable percentage of their costs of

responding to union-organizing campaigns, while at the same time (b) obligating the Government to pay the higher costs of union wages (which can be retroactive to the beginning of the union campaign), employee benefits, and additional union-related costs such as shop stewards, labor management committees, grievance arbitration proceedings, and other such activities resulting from a collective bargaining agreement. *See* FAR § 31.205-21 (1999).

125.    The amendment to FAR § 31.205-21 disturbs this balance by disallowing costs incurred by contractors in responding to a union campaign, while at the same time continuing to allow increased contractor costs resulting from unionization. That is, to the extent that the activities in newly-designated FAR § 31.205-21(a) are deemed allowable, they would assist, if not promote, unionization. On the other hand, any costs deemed to "deter" unionization— whatever that might mean—are expressly unallowable under new FAR § 31.205-21(b).

126.    Because the Final Rule disturbs the balance formerly recognized in FAR § 31.205-21, it violates the neutrality obligation encapsulated in FAR § 22.101-1(b), and is thus contrary to law.

<div align="center">

**Count 4**
**The Amendments to FAR Part 52 Are Invalid**
**Because They Are Founded Upon The FAR Council's**
**Arbitrary, Capricious, And Unlawful Paperwork Reduction Act Analyses**

</div>

**A.    The FAR Council's Final PRA Analysis Is Arbitrary and Capricious.**

127.    Paragraphs 1 through 126 are incorporated by reference as if set forth fully herein.

128.    The primary purpose of the PRA is to "minimize the paperwork burden for individuals, small businesses, . . . Federal contractors, . . . and other persons resulting from the collection of information by or for the Federal Government." 44 U.S.C. § 3501(1).

129.    The PRA requires agencies to prepare an estimate of the paperwork "burden"

caused by each information collection. *Id.* § 3506(c)(3). "Burden" is defined as the "time, effort, or financial resources expended by persons to generate, maintain, or provide information to or for a Federal agency." *Id.* § 3502(2).

130.    Agencies' paperwork burden estimates must encompass all burdens associated with a collection of information. OMB's regulations implementing the PRA require agencies to publish an estimate of the "total annual reporting and recordkeeping burden that will result from the collection of information." 5 C.F.R. § 1320.5(a)(1)(iv)(B)(5).

131.    Congress has stated that another purpose of the PRA is to "minimize the cost to the Government of the creation, collection, maintenance, use, dissemination, and disposition of information." 44 U.S.C. § 3501(5). Consistent with this statutory purpose, OMB regulations require that each agency "shall also seek to minimize the cost to itself of collecting, processing, and using the information" collected from the public in response to an agency regulation or certification. 5 C.F.R. § 1320.5(d)(1)(iii).

132.    The June 2000 proposed rule, like the Final Rule, would have amended two existing FAR Part 52 provisions to create two new contractor certification requirements: FAR § 52.212-3, which is required in all solicitations for the acquisition of commercial items; and FAR § 52.209-5, which is mandatory in all solicitations exceeding the simplified acquisition threshold, currently $100,000. *See* 65 Fed. Reg. at 80,265-66.

133.    The FAR Council prepared an initial PRA justification, which it made available to the public in connection with the June 2000 proposed rule, which estimated that the proposed certifications would impose an annual paperwork burden exceeding 12.8 million man-hours, with an associated annual cost of more than $679 million on contractors and the Government.

134.    The FAR Council's second PRA justification, which was synopsized in the June 2000 proposed rule, estimated that the annual paperwork burden of the two proposed certification provisions would be less than 2.3 million man-hours, with an associated total annual cost of $98.6 million on the public and the Government.  The FAR Council has provided no explanation for this dramatic reduction in its hour and cost estimates prepared for the certification contained in the June 2000 proposed rule.

135.    The Final Rule amends FAR Part 52 by including two certification provisions that are substantially similar to the provisions in the June 2000 proposed rule.  *See* 65 Fed. Reg. at 80,265-66 (to be codified at FAR §§ 52.209-5(a)(1)(ii) and 52.212-3(h)(3), (4)).  The FAR Council prepared a third paperwork burden estimate to accompany the Final Rule, which is synopsized in the Final Rule.  *See id*. at 80,263-64.  This third PRA analysis estimates that the two certification provisions impose a still lower annual burden of approximately 2.2 million man-hours, equivalent to an annual cost of approximately $98 million to the public and the Government.  The FAR Council's final estimate of the cost imposed by the certification provisions represents a decrease of 10.6 million man-hours (83%) and $581 million (86%) from the hour and cost estimates stated in its initial PRA justification.

136.    The FAR Council's final PRA analysis reduces the estimate of the public burden of responding to the two certification provisions by 190,000 man-hours from the second PRA analysis.  This reduction represents 37% of the estimated contractor man-hour burden in the June 2000 proposed rule.  The sole explanation offered for this reduction is that "[t]he final rule does not require any information other than the certification."

137.    The FAR Council has failed to present any rational explanation to support the hour and cost burdens stated in its final PRA justification.  It has failed to provide any rational

explanation for the huge discrepancy between its first PRA estimate and the estimate published in the Final Rule. It has also failed to provide a rational explanation for the estimated reduction in the paperwork burden involved in responding to the certification provisions in the Final Rule, as compared to the versions in the June 2000 proposed rule.

138.    Accordingly, the FAR Council's PRA paperwork burden and cost estimate, which is an important basis upon which the Final Rule was promulgated, is arbitrary, capricious, an abuse of discretion, and contrary to law.

**B.    The FAR Council's Final PRA Analysis Unlawfully Fails to Consider Adequately Statutorily-Required Burden Elements.**

139.    Paragraphs 1 through 138 are incorporated by reference as if set forth fully herein.

140.    The PRA explicitly defines the term "burden" to include "the resources expended for . . . acquiring, installing, and utilizing technology and systems." 44 U.S.C. § 3502(2); *see also* 5 C.F.R. § 1320.3(b)(1).

141.    The final PRA analysis accompanying the Final Rule, like the June 2000 proposed rule, estimates that 50,000 contractors will be affected by the new certification requirements. Further, the FAR Council estimates that COs, following receipt of the new certifications, will demand additional information from 30,000 of these contractors.

142.    To comply with the Final Rule's certification requirements -- which carry criminal penalties for improper certifications -- contractors are now required to develop, acquire, install, and utilize systems to track: (a) their compliance with all state, federal, and foreign laws; and (b) specifically, any state or federal felony convictions or indictments, any adverse civil judgments in federal court in cases brought by the United States, and any adverse decisions by federal judges, boards, or commissions that indicate a willful violation of law. The FAR Council

acknowledged this recordkeeping obligation for the first time in the Final Rule:

> We concur that most large businesses and some small businesses
> will probably establish a new system or augment a current system
> to track such compliance.  Such a system would be required in any
> complex organization to obtain the significant reductions that we
> have built into the estimates of subsequent response time.

65 Fed. Reg. at 80,264.

143.   The third PRA analysis acknowledges that contractors will be required to

incorporate an "average of 6 hours per year for recordkeeping for each of the 30,000 respondents

to [a CO's] request for additional information."  *Id*.

144.   This recordkeeping estimate is flawed in two critical respects.  First, it

dramatically underestimates the time required to maintain and update recordkeeping systems

necessitated by the Final Rule.  Second, the FAR Council's estimate improperly and irrationally

determines that only the 30,000 contractors that are asked to provide additional information will

be required to implement recordkeeping systems.  In fact, all 50,000 contractors that are affected

by the certification provisions in the Final Rule will be required to maintain recordkeeping

systems to avoid potential civil and criminal liability under the False Statements Act, 18 U.S.C.

§ 1001, and to be able to respond to CO requests for additional information.

145.   Further, to make effective use of the information collection imposed by the Final

Rule, federal agencies will be required to develop, acquire, install, and utilize databases to

monitor a variety of actions relating to contractors, including all decisions and civil or

administrative complaints indicating that a contractor has been found to have violated a federal

law.  Indeed, several agencies indicated in their formal comments opposing the proposed rules

that the Final Rule will necessitate the development and implementation of a system linking

individual agency databases to allow COs to search all of these databases for information on

contractors' violations of law.

146.     The FAR Council's final PRA analysis fails to include any assessment of the cost to the government of developing, acquiring, installing, and utilizing systems necessary to effectively implement the Final Rule.

147.     Because the PRA analysis in the Final Rule fails to consider adequately all of the costs that will be borne by the Government in implementing the Final Rule, the FAR Council's estimate of the total annual cost to the public and the Government underestimates the full impact of the Final Rule.  If properly calculated, the true annual cost would significantly exceed $100 million, thereby triggering the FAR Council's obligation to perform a critical cost-benefit analysis of the rule, subject to review by OMB and the Comptroller General under EO 12866 and SBREFA.

148.     As a result of these failings, the FAR Council's entire PRA analysis, upon which the Final Rule is based, is arbitrary, capricious, and contrary to law.  Accordingly, the Final Rule was not promulgated in accordance with law and cannot be accorded the force and effect of law.

**C.     The FAR Council Has Failed to Plan and Allocate Resources for the Effective Management and Use of the Information to Be Collected, Contrary to the Requirements of the PRA and OMB Regulations.**

149.     Paragraphs 1 through 148 are incorporated by reference as if set forth fully herein.

150.     Under the PRA, an agency is prohibited from issuing a regulation that imposes an information collection unless it can certify that the rule "has been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected, including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public."  44 U.S.C. § 3506(c)(3)(H).

151.     The Government's own procurement professionals -- including officials from the DOD, GSA, and NASA, the agencies which conduct more than 75% of the dollar value of all federal procurements -- objected to issuance of a Final Rule on the ground that they lack the resources and expertise to effectively use the information being collected under the new regulations.

152.     The FAR Council completely ignored the concerns of these agencies and instead adopted the Final Rule, which requires contractors to submit, and federal agencies to process and use, these new certifications with every contract award.  The Final Rule includes no provision for the management and processing by federal agencies of the overwhelming information submissions associated with these certification provisions.  As a result, the FAR Council has failed to satisfy its statutory obligation under 44 U.S.C. § 3506(c)(3)(H).

153.     Because of this failure, the FAR Council's Final Rule will require contractors to comply (at substantial cost) with a needless collection of information.  The Final Rule is therefore arbitrary, capricious, an abuse of discretion and otherwise contrary to law.

### Count 5
### The Final Rule Is Arbitrary, Capricious, an
### Abuse of Discretion, and Unlawful Because the FAR Council
### Failed to Comply with the Requirements of the Regulatory Flexibility Act

154.     Paragraphs 1 through 153 are incorporated by reference as if set forth fully herein.

155.     Under the RFA, an agency must conduct a Final Regulatory Flexibility Analysis unless "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."  5 U.S.C. § 605(b).

156.     In June 2000, the FAR Council issued an IRFA which purportedly "supports a conclusion that this rule would not likely have a significant economic impact on a substantial

number of small entities." In its formal comments on the Proposed Rule, the SBA's Office of the Chief Counsel for Advocacy, pointed out that the FAR Council's IRFA failed to provide an analytically sound estimate of the number of small entities affected by the proposed rule, and specifically requested that the FAR Council prepare "a more detailed statistical [IRFA] and that the revised analysis be published for comment in the *Federal Register*."

157.    The FAR Council acknowledged that the Final Rule will apply to, and thus burden, approximately 171,000 small entities. Based on this fact, it conceded that "the rule will apply to a substantial number of small entities." 65 Fed. Reg. at 80,262. The FAR Council also acknowledged that small businesses will be required to complete the FAR Part 52 certification provisions and respond to requests for further information. Moreover, the Council even conceded that small businesses will need to establish and maintain systems to track their compliance with all state, federal, and foreign laws and regulations.

158.    Despite this recognition that the Final Rule will apply to a substantial number of entities and that it will impose significant burdens, the FAR Council certified that the Final Rule will not have a "significant economic impact on a substantial number of small entities."

159.    In making this certification, the FAR Council did not engage in any meaningful analysis of the effect of the proposed rule on small entities. The FAR Council did not prepare, publish, or make available to the public any additional documentation to support or justify its RFA certification. Instead, the Council relied only on broad, unsupported, and largely irrelevant generalizations such as the following:

- "The FAR Council has long believed that small entities are generally law-abiding."
- "[W]e cannot conclude that violations of law by small entities occur in such a number as to render a substantial number nonresponsible under the provisions of this rule."

- "The FAR Council, therefore, does not expect that there will be a substantial number of small businesses that will be found, by a [CO], to have an unsatisfactory 'record of integrity and business ethics.'"

160.    The RFA certification offered by the FAR Council apparently relies upon the assumption that the Final Rule will not have a significant economic impact on small entities because most small entities are generally law-abiding and few such companies will be determined to be non-responsible.  This analysis fails to recognize that the Final Rule places burdens on all of the 171,000 small entities affected by the Final Rule, regardless of whether they are determined to be responsible or non-responsible.  This analysis is inconsistent, too, with the purported need to promulgate the Final Rule in order to avoid contracting with so-called lawbreakers.  If small businesses are generally law-abiding and do not warrant the performance of a Final Regulatory Flexibility Act analysis, then SBA could have and should have excluded them from the rule.

161.    The RFA analysis prepared by the FAR Council to support the Final Rule fails to account for the significant economic impact of the Final Rule on small businesses.  It is thus wholly irrational, inadequate, and contrary to law.  Therefore, the Final Rule, which is based on this flawed RFA analysis, is arbitrary, capricious, an abuse of discretion and otherwise contrary to law.

## VIII.
## INJURY

162.    Paragraphs 1 through 161 are incorporated by reference as if set forth fully herein.

163.    Under the FAR, COs must affirmatively determine a contractor's responsibility before the award of *every* government contract.  *See* FAR § 9.103.  Therefore, in all solicitations following the issuance of the Final Rule, contractors must present evidence regarding, and COs

must evaluate, a contractor's record of satisfactory compliance with all laws, especially federal tax laws, labor and employment laws, environmental laws, antitrust laws, and consumer protection laws. In Fiscal Year 1999, federal agencies conducted more than 10 million procurement actions, or an average of more than *28,000 procurement actions every single day of the year*.

164.    Plaintiffs' members, specifically small entities, will lose contracts as the result of the Final Rule. In addition, when that happens, Plaintiffs' members will incur substantial costs to challenge non-responsibility determinations.

165.    Moreover, the Final Rule includes a certification at FAR § 52.212-3 that is mandatory for inclusion in *all* solicitations for the acquisition of commercial items, as well as a certification at FAR § 52.209-5 that is mandatory for inclusion in all solicitations expected to exceed $100,000. In order to comply with the responsibility standards and certification requirements of the Final Rule, and avoid criminal liability or the denial of federal government contracts, all government contractors, including Plaintiffs' members, are now required to institute immediately appropriate compliance procedures and mechanisms for reporting compliance with the myriad laws governing tax, labor and employment, environmental, antitrust, and consumer protection.

166.    If a contractor fails to complete the required certification, or completes the certification incorrectly, it faces the risk that it will be deemed "non-responsible" or that its bid will be deemed "non-responsive," and it will lose the opportunity to compete for and receive a contract. Contractors also face the risk of criminal prosecution under the False Statements Act if they incorrectly complete the Final Rule's certification. *See* FAR §§ 52.209-5(a).

167.    Moreover, as a result of the Final Rule's change in FAR § 31.205-21 to disallow "[c]osts incurred for activities that assist, promote, or deter unionization," government contractors, including Plaintiffs' members, will suffer financial harm. They will be denied the recovery of labor relations costs which they were previously entitled to recover, either as direct costs or as part of the general overhead costs charged to their government contracts, under the existing FAR cost principles.  In addition, contractors will be required to implement immediately accounting systems to account for and segregate these newly-unallowable costs.

168.    In addition to this financial harm, the changes in FAR § 31.205-21 will handicap government contractors, including Plaintiffs' members, in their ability to respond to unionization campaigns, and to make their views on the value and consequences of unionization known to their employees.

169.    As a result of the change to FAR § 31.205-47, government contractors, including Plaintiffs' members, will suffer the financial harm of being denied recovery of legal defense costs which they were previously entitled to recover under FAR cost principles and which continue to be allowed by the Major Fraud Act.

170.    Furthermore, if the FAR Council had conducted a proper and adequate PRA analysis, as required by law, it would have realized that the true annual burden imposed on contractors by the Final Rule is hundreds of millions of dollars.  This, in turn, would have triggered the requirement to prepare a detailed cost-benefit analysis and submit such analysis to GAO for scrutiny.   As a result, it is probable that the FAR Council would have elected not to promulgate the Final Rule or would have promulgated a revised rule that would be less burdensome on Plaintiffs and their members.

171.    Finally, if the FAR Council had conducted a proper and adequate RFA analysis, including a Final Regulatory Flexibility Analysis, it would have realized that the Final Rule will have a dramatic effect on small entities.  As a result, it is probable that the FAR Council would have elected not to promulgate the Final Rule, or would have promulgated a revised rule that would be less burdensome on small entities.

## IX.
## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiffs pray that the Court grant the following relief:

(a)    A Declaratory Judgment and Order that the Final Rule is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law;

(b)    An Order entering a Permanent Injunction enjoining defendants from implementing the Final Rule and directing defendants to rescind immediately the Final Rule and publish immediately a notice to that effect in the *Federal Register*;

(c)    A Declaratory Judgment and Order that:  (1) the certifications in the Final Rule are invalid; (2) federal agencies are prohibited from conducting or sponsoring the collection of information contained in the Final Rule; and (3) federal agencies are prohibited from utilizing, or penalizing contractors for failing to complete or submit, the certifications in the Final Rule.

(d)    An Order awarding Plaintiffs their costs and reasonable attorneys' fees in connection with this action; and

(e)     An Order granting such other and further relief as the Court deems necessary, just

and proper.

Respectfully submitted,

Rand L. Allen – Bar No. 240226
Scott M. McCaleb – Bar No. 439925
Kevin J. Maynard -– Bar No. 456673
Derek A. Yeo – Bar No. 468938
WILEY, REIN & FIELDING
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000


Reginald E. Jones – Bar No. 422118
Burton J. Fishman – Bar No. 290478
David S. Fortney – Bar No. 454943
OGLETREE, DEAKINS, NASH, SMOAK &
          STEWART, P.C.
2400 N Street, N.W.
Suite 500
Washington, D.C.  20037
(202) 887-0855
*Counsel for Plaintiffs*

Stephen A. Bokat – Bar No. 175919
Robin S. Conrad – Bar No. 342774
NATIONAL CHAMBER LITIGATION
          CENTER, INC.
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337
*Of Counsel*

Dated: December 22, 2000